UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CRIMINAL ACTION NO. 3:13CR-149-JHM

UNITED STATES OF AMERICA,                                              PLAINTIFF

VS.

KENNETH FLINTROY, JR.,                                                 DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Kenneth Flintroy, Jr.'s ("Flintroy") Motion to Suppress Evidence [DN 14], Motion to Suppress Statements Made by the Defendant to Law Enforcement [DN 15], and Motion to Suppress Photo Identification and in Court Identification [DN 16]. Having come before a hearing, these matters are ripe for decision.

**I. BACKGROUND**

This action arises out of a robbery of the McDonald's located at 8600 Dixie Highway in Louisville, Kentucky on May 2, 2013. At the scene of the robbery, the police arrested two individuals, Donte Edwards ("Edwards") and Cory Crowe ("Crowe"), who were believed to be get-away drivers. Immediately following their arrest, the police took Edwards and Crowe back to the police station in order to question them concerning the robbery. During the course of the interview, both Edwards and Crowe implicated Flintroy (or "Defendant") in the robbery of the Dixie Highway McDonald's.

In addition to discussing the Dixie Highway robbery, the police showed Crowe and Edwards surveillance camera photos from other unsolved robberies at fast food establishments in

the Louisville area that the police thought resembled the robbery of the Dixie Highway McDonald's. Based upon statements from Edwards and Crowe, the police connected Flintroy to the robberies of the Papa Johns located at 6902 Southside Drive and the McDonald's located at 7426 3rd Street Road on April 16, 2013.

Following the interviews with Crowe and Edwards, police officers went to Defendant's parents' house, which is where they believed Flintroy was living. The police did not obtain a search or arrest warrant prior to arriving at the Flintroy home and were let into the house by an unidentified male. During a sweep of the house, the police found Flintroy asleep in his room. After arresting Defendant, the police obtained written consent from both Flintroy's mother and Flintroy to search the house. As a result of the search, the police discovered items that they believed were used in connection with all three of the robberies.

Defendant seeks to have the Court suppress the photo identifications made by Crowe and Edwards, the evidence found in his parents' house, and the statements he made at the police station following his arrest. At the hearing held on June 3, 2014, Edwards, Crowe, Detective Simpson, and Ms. Flintroy, the Defendant's mother, testified concerning their knowledge of the events that led to the arrest of Defendant.

**A. Interview and Photo Identification by Edwards and Crowe**

After questioning Edwards and Crowe about their involvement with the Dixie Highway McDonald's robbery, the police sought information concerning the robbery of the Southside Drive Papa John's and the 3rd Street McDonald's. When the police asked Edwards whether he had been involved in any previous robberies, he denied committing any additional robberies but informed police that Flintroy had confessed to him that he had committed others. As for Crowe, it is unclear as to whether he initially mentioned Flintroy's involvement in other robberies or

whether the police broached the subject. Regardless, the police showed both Edwards and Crowe pictures from a surveillance camera that captured the robbery of the Southside Papa John's and the 3rd Street McDonald's. Although both Edwards and Crowe noticed certain items worn by the alleged robber in the pictures and associated those items with Flintroy, they could not absolutely identify the person in the images as Flintroy due to the fact that the person was wearing a disguise during the robberies.

When asked about the images from the Papa John's robbery, Edwards said that he recognized the Echo hoodie and the red backpack in the picture as items similar to those owned by the Defendant. In fact, he went into some detail about how he knew that Flintroy owned a very similar backpack. While the person involved with the Southside McDonald's robbery was not wearing an Echo hoodie, Edwards recognized the red backpack again. Edwards also commented on the fact that the person in the picture from McDonald's was wearing baggie clothes, a style that he associated with Defendant. At the direction of the police, Edwards wrote, "This is Kenny" on the photo arrays.

The police also asked Crowe if he recognized anyone in the images from the Southside Drive Papa John's and the 3rd Street McDonald's robberies. According to Crowe, he told the police that he thought that Flintroy owned a sweatshirt similar to the one worn by the person in the picture from Papa John's, but he was unable to identify any other item of clothing as belonging to the Defendant. Similar to Edwards, the police also had Crowe write, "Kenny" on the images.

**B. Search of Residence**

Based on information provided by Edwards and Crowe and other evidence collected from the Dixie Highway McDonald's, the police went to arrest Flintroy at his parents' house located at

7213 Gerber Avenue. After positioning officers around the house, Detective Simpson knocked on the door and a young black male answered the door. There is a factual dispute concerning the presence and living situation concerning the young man who answered the door. According to Ms. Flintroy, the unidentified individual, who she referred to as "Slim," lives in Miami, Florida and had been staying with the family for a couple of nights to make music with her son. In contrast, Detective Simpson testified that the young male told him that he was using the recording studio in the basement, that he lived in the neighborhood and could come and go as he pleased regardless of whether anyone was home. After asking the individual about why he was at the Flintroy home, Detective Simpson said that he next asked him if anyone else was present at the house. The unidentified person told police that he did not think anyone else was at the house. Based on the discussion with the unidentified male, Detective Simpson determined that he had "control" of the house and asked him if the police could enter the home. According to Detective Simpson, the young male agreed to let the police come inside the house.

Upon entering the home, the police did an initial sweep to determine if other individuals were in the house. It is during this sweep that Detective Simpson located Defendant Flintroy in his room asleep on the bed. Detective Simpson told Defendant to come out into the hallway and another police officer placed handcuffs on him. After placing Flintroy on a couch in the living room next to the unidentified individual, the police proceeded to continue to sweep the entire house for other individuals. At some point during the initial sweep of the house, Detective Simpson located a red backpack that he believed was used in previous robberies, but he did not do anything with it at that time other than make note of it.

After completing a sweep of the house, the police attempted to contact Defendant's parents, who were the owners of the house. Detective Simpson stated that he obtained their

contact information from the unidentified individual who initially answered the door. Both the timeline and the incidents that follow contact with the parents are fairly unclear. According to Detective Simpson, Defendant's mother was the first to arrive and she gave police consent to search the house. On the other hand, Ms. Flintroy testified that her husband was the first one home and that he talked to the police before she got there. Regardless, at some point after her arrival, the police obtained written consent from Ms. Flintroy to search the house. The police also obtained written consent from Defendant to search his room after learning that he occasionally paid rent to his parents for the use of his room. During the search of Defendant's room, police officers seized items that they believed were utilized in the previous robberies, including a red backpack, a pair of sunglasses, a hooded sweatshirt, money, and a gun. Police officers completed the search of the house and then transported Flintroy to police headquarters.

Prior to questioning Flintroy at the police station, Detective Crowell obtained a signed waiver of Miranda rights from him. The police then proceeded to ask Defendant about his suspected involvement with the Dixie Highway McDonald's robbery and the evidence that they found at his parents' house. Flintroy claimed that he was at an apartment complex near where the Dixie Highway McDonald's robbery took place, but he denied being involved with it. As far as the evidence collected at the house, Defendant said that he saw an individual run past the apartment and that the person dropped the backpack as he was fleeing. When Defendant went to inspect the backpack, he said that he found money and a gun in it.

## II. ANALYSIS

### A. Photo Identification

Defendant seeks to suppress Edwards' and Crowe's photo identification of Defendant related to the Southside Papa John's and the 3rd Street McDonald's robberies. Primarily,

Defendant contends that Crowe and Edwards could not actually identify the person in the picture because the individual had on a disguise, which made it impossible to see his face. In contrast, the United States explains that Crowe and Edwards should be allowed to testify to what they recognize in the picture, specifically the red backpack and the Echo hoodie. The United States argues that neither Crowe nor Edwards plan to testify that the person in the picture is absolutely Flintroy as their statements will be limited to describing the items worn by the person in the photo and the fact that Defendant owns similar items.

In moving to suppress, Defendant attempts to equate the facts of this case to those involving identifications made by eyewitnesses, such as in Neil v. Biggers, 409 U.S. 188, 197, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Defendant's reliance on Biggers is misplaced as it inapplicable to the facts of this case. Courts apply Biggers when there is a question concerning an eyewitness at the scene of the crime who later identifies a subject. Clearly, neither Edwards nor Crowe is planning to testify as eyewitness to the robberies of the Southside Papa John's or the 3rd Street McDonald's. In this case, Edwards and Crowe will simply testify that various items shown in the surveillance photos are similar to items possessed by the Defendant, and furthermore, they will identify a style of dress which they associate with the Defendant. It is clear that Edwards and Crowe do not intend to testify that the person in the surveillance photos is the Defendant. Therefore, Defendant's motion to suppress the photo identification is **DENIED**. However, the statements "This is Kenny" and "Kenny" that are written on the photos must be redacted if the photos are used at trial because this would appear to suggest that Edwards and Crowe are identifying Flintroy as the person in the picture as opposed to simply describing the items worn by the person.

### B. Third Party Consent

Defendant contends that Slim, the unidentified individual who answered the door, lacked common authority to consent to an entry of the house by the police. As such, Defendant argues that any evidence collected from that illegal entry must be suppressed as fruit of the poisonous tree. In response, the United States asserts that Slim had common authority over the premises and if not, that the police acted reasonably in believing that he did. Also, even if the police did not have legal authority to enter the property, the United States posits that both the passage of time and intervening circumstances provided sufficient attenuation to dissipate any potential taint from an illegal entry.

"The fourth amendment prohibits governmental intrusions into a private dwelling without a warrant supported by probable cause, subject only to a few carefully delineated exceptions." United States v. Sangineto-Miranda, 859 F.2d 1501, 1511 (6th Cir. 1988) (citing Thompson v. Louisiana, 469 U.S. 17, 19–20, 105 S.Ct. 409, 410–11, 83 L.Ed.2d 246 (1984)). However, "a warrantless entry and search by law enforcement officers does not violate the Fourth Amendment's proscription of 'unreasonable searches and seizures' if the officers have obtained the consent of a third party who possesses common authority over the premises." Illinois v. Rodriguez, 497 U.S. 177, 179, 110 S. Ct. 2793, 2796, 111 L. Ed. 2d 148 (1990). For the purposes of consent, common authority is defined as follows:

> [The] mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."

United States v. Hunyady, 409 F.3d 297, 303 (6th Cir. 2005) (quoting United States v. Matlock, 415 U.S. 164, 171-72 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)). Thus, the Court will first examine whether Slim had common authority over the premises.

1. **Common Authority**

The facts in this case remain both unclear and sparse as to the exact nature of Slim's presence in the Flintroy home. Was he a cohabitant, an overnight guest, or just someone who had free access to the premises? Regardless, when examining whether an individual has common authority to consent to entry of a home, courts consider multiple factors, none of which tend to be dispositive. See, e.g., Pratt v. United States, 214 Fed. Appx. 532, 535 (6th Cir. Jan.22, 2007) ("[C]ourts consider a number of factors in determining whether common authority exists, including: whether the co-occupant owns the residence or is named on the lease; if the individual contributed rent; and whether the individual visited the residence when the co-occupant was not present."). Illinois v. Rodriguez is instructive on the issue of common authority for cohabitants. In Rodriguez, the Supreme Court determined that Fisher, the cohabitating girlfriend of the defendant, lacked common authority to consent to a search of the defendant's apartment.[1] Rodriguez, 497 U.S. at 181-82. While Rodriguez did not create an exhaustive list of what to consider in determining whether an individual has common authority, the Court did consider the fact that Fisher had moved out a month prior to the search, her name was not on the lease, she did not pay rent, and she would not be in the house without the defendant present. Id. The Court also noted that she still stayed there on some nights, had a key to his place, and left some furniture and personal effects at his place. Id. Taking these factors into consideration, the Court concluded that the government had failed to show that she had "joint access or control for most purposes" of defendant's apartment. Id.

There is no evidence that Slim paid any rent or that he was a regular occupant of the house. There is no evidence to suggest that he was a cohabitant of the premises in the sense that

---

[1] The Supreme Court reversed and remanded the case for the lower court to make a factual finding as to whether the police reasonably believed that Fisher had apparent authority even though she lacked actual authority. Rodriguez, 497 U.S. at 189.

he had or exercised any particular rights to the property. He was at most a guest who obviously had the right to be in the premises while the owners were away. Thus, the facts of Rodriguez are not very helpful in deciding this case, however, United States v. Ayoub, 498 F.3d 532, 538 (6th Cir. 2007) and United States v. Jones, 335 F.3d 527 (2003) are more instructive under the current facts. Ayoub involved a situation where police sought consent to search a house from Atoui, the daughter of the owners of the house. Ayoub, 498 F.3d at 536. The police were in the process of investigating her half-brother, Ayoub, and believed that he was using his parents' house for drug related activity. Id. During the investigation of Ayoub, the police had learned from his half-brother that Atoui was taking care of the house while her parents were in Lebanon. Id. When the police went to the house to obtain consent from Atoui, she confirmed that she was in charge of the house because her parents were out of the country. Id. Finding that Atoui had the requisite common authority to allow a search of the home, the court noted that "not only was Atoui the caretaker of the home during the time her parents were in Lebanon, she of course also has greater authority than a typical employee as the daughter of the homeowners who were not occupying the premises at the time." Id. at 539.

The Sixth Circuit in Ayoub based much of its decision upon contrasting the facts of the case with that of those found in Jones. In Jones, the defendant owner of the house was not present when the police sought consent to search his home. Jones at 529. In fact, the police had arrested the defendant prior to going to his house and asked him if he would consent to a search of his home, which he denied. Id. Based upon surveillance of Jones residence prior to his arrest, the police knew that two other individuals, Teasley and Dickason, were frequently at the defendant's house. Id. Teasley was the defendant's handyman and Dickason was an overnight guest in the defendant's home. Id. at 530. When the police went to Jones' house after arresting

9

him, Teasley answered the door and informed the police that he was there cleaning the house. Id. The police obtained consent from Teasley to enter the house. Id. at 529-30. Upon entering the house, the police encountered Dickason who informed them that he was also working on the house. Id. at 530. After some questions about Dickason's prior incarceration, he told the police that his identification (ID) was in a back bedroom. The police subsequently asked if they could go in the back in order to retrieve his ID, which Dickason permitted. Id. While in the back bedroom, police officers noticed firearms and drug paraphernalia. A search warrant was obtained for the house based upon this evidence. Id.

As an initial matter in reviewing the facts of Jones, the Sixth Circuit clarified a factual misunderstanding made by the magistrate judge. Specifically, the magistrate had identified both Teasley and Disckason as overnight guests of the defendant even though there was no evidence to suggest that Teasley was anything more than an employee. Jones at 530. However, the Sixth Circuit noted that "[e]ven labeling Teasley as an overnight guest, however, would not change what we conclude is the proper outcome of this case." Id.[2] Based on Teasley's status as an employee, the Sixth Circuit concluded that he "clearly lacked actual authority to permit" police to enter the home. Id. at 531. In the process of coming to this conclusion, the Sixth Circuit provided the following insight in to the common authority analysis:

> The question of when an employee's consent is sufficient for entry into a residence has not been treated uniformly by the courts. 3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 8.6(c) (3d ed. 2002). Some have relied on a theory of agency, while others depend entirely on whether

---

[2] Judge Kennedy, writing for the dissent, noted that "[t]he majority does not contend that Dickason, known to [the police] as an overnight guest for at least two days, could not consent to the entry of Dickason's bedroom. As an overnight guest, Dickason had authority to permit [the police officer] to go [to] the bedroom to get Dickason's identification." United States v. Jones, 335 F.3d 527, 534 (6th Cir. 2003). However, this appears to be directly contradictory to both the Sixth Circuit's finding in Jones and Ayoub. Jones at 530; Ayoub at 538 ("We noted, however, that even if [Teasley] were an overnight guest, such as Dickason, the outcome would have been the same.").

10

> the employee had apparent authority. Id. In general, the cases have engaged in a fact-specific analysis of the level of responsibility given to the employee. If the employee's job duties include the granting of access to the premises, authority to consent is more likely to be found. A caretaker left in charge of a home for several weeks, for example, might have authority to permit entry, while a worker who is present on a more limited basis would not. Id.

Jones at 531. The Sixth Circuit in Ayoub revisited the holding in Jones and again concluded that neither of Jones' employees, "both of whom had lesser possessory rights to the premises than [he did], could give lawful consent for the officers to enter the premises." Ayoub at 538.

Based upon the facts of the present case, the Court finds that Slim's status in the home to be more analogous to the situation analyzed in Jones than in Ayoub. Primarily, there is no evidence to suggest that Slim was acting as a caretaker in any capacity or that he occupied the house for any extended period of time. Instead, the evidence clearly establishes the fact that the Flintroys were still in town when the police entered the home. In fact, Defendant's parents arrived home shortly after they were contacted by the police. Furthermore, Slim's activity in the house appears to have been fairly confined to the basement, which suggests that allowing people into the house would not be part of his work or purpose in the home. Indicative of this conclusion is the fact that Slim told the police that he did not believe anyone else was in the house even though Flintroy was in his room at this time. Clearly, someone who was a caretaker of a house would know if others were in the house as well.

"The government bears the burden of establishing the effectiveness of a third party's consent." United States v. Waller, 426 F.3d 838, 845 (6th Cir. 2005) (citing Rodriguez, 497 U.S. at 181). The evidence shows only that Slim was an overnight guest in the home for a at most a couple of days prior to the day in question. He did not live there. He did not get mail there. He did not have keys to the house. He was there to use the recording studio in the basement. There

is nothing in the evidence to suggest that Slim had common authority over the premises sufficient for him to consent to a search of the home.

   2. **Apparent Authority**

Even though the Court has determined that Slim did not have actual common authority, the consent may still be valid as long as the police "relied in good faith on a third party's *apparent* authority to consent to the search." United States v. Hunyady, 409 F.3d 297, 303 (6th Cir. 2005) (quoting United States v. Gillis, 358 F.3d 386, 390 (6th Cir. 2004)). If the property is not owned by the person who consents, "the consent is valid if 'the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.'" United States v. Jenkins, 92 F.3d 430, 436 (6th Cir. 1996) (quoting Rodriguez, 497 U.S. at 188). In certain circumstances, a lack of clarity regarding ownership and use of a property may require further inquiry by police officers. See Waller, 426 F.3d at 846. Thus, "[t]he government cannot establish that its agents reasonably relied upon a third party's apparent authority 'if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry.'" Id (internal quotation marks and citation omitted).

The United States argues that the police acted reasonably in believing that Slim had apparent authority to permit entry. Defendant contends that the testimony of Detective Simpson clearly demonstrated that the police knew very little about the individual who answered the door. As such, the Defendant asserts that the United States fails to meet its burden of establishing the validity of their warrantless entry of the house.

The reasonableness of the determination that Slim had apparent authority must be assessed solely on what Detective Simpson believed about Slim "at the moment" he obtained consent. See Jenkins, 92 F.3d at 436. During the hearing on these motions, Detective Simpson

indicated that he did not inquire much about the individual who answered the door. In fact, the very few things that Detective Simpson learned about the individual should have prompted more inquiry on the part of Detective Simpson. 4 Wayne R. LaFave, <u>Search & Seizure: A Treatise on the Fourth Amendment</u>, § 8.3(g) (5th ed. 2013) ("But sometimes the facts known by the police cry out for further inquiry, and when this is the case it is not reasonable for the police to proceed on the theory that 'ignorance is bliss.'"). The mere fact that Slim was using the recording studio at the Flintroy's house does not indicate that he had authority over the entire house. Particularly troubling is the fact that Detective Simpson did not even ascertain the identity of the individual. Detective Simpson testified that the individual told him he was a neighbor. Yet, based on the testimony of Ms. Flintroy, it is quite possible that Slim's identification would have indicated an address in Miami rather than Louisville. Certainly that would have raised more questions about Slim's presence in the home. But it seems to the Court that the officers were not particularly interested in raising questions about Slim, they were simply satisfied that he allowed them into the home. It is also telling that the police contacted Defendant's parents in order to have them come to the house and consent to the search. This substantially weighs against the argument that they reasonably believed that Slim had apparent authority to consent to them entering the house. As a result, the Court must conclude that based on what the police knew about Slim at the time, it was unreasonable to conclude that he had authority to consent to a search of the Flintroy's home.

**C. Attenuation**

Based on the previous finding that the police violated the Fourth Amendment by executing a warrantless entry of home without proper consent, the next issue is to determine how much evidence, if any, must be suppressed in this case. "In order to deter law enforcement

officials from violating the Fourth Amendment by stopping persons without reasonable suspicion or by arresting them without probable cause, the Supreme Court has directed that 'all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court regardless of its source.'" United States v. Pearce, 531 F.3d 374, 381 (6th Cir. 2008) (quoting Mapp v. Ohio, 367 U.S. 643, 654, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)). "The 'fruit of the poisonous tree' doctrine supplants this rule by barring evidence that police derivatively obtain from the unconstitutional search or seizure." United States v. Royal, 523 F. App'x 377, 387 (6th Cir. 2013) (citing Williams, 615 F.3d 657, 669 (6th Cir. 2010). However, "where the connection between the unlawful detention and evidence ha[s] become sufficiently attenuated to dissipate the taint[,]" the evidence will not need to be excluded. Id. Key to the determination of sufficient attenuation is whether "the incriminating evidence was 'come at by exploitation of th[e] illegality' of the seizure,'" or "'by means sufficiently distinguishable to be purged of the primary taint.'" Williams, 615 F.3d at 669 (quoting Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). When examining the issue of attenuation, the Supreme Court has provided three factors to assist in this inquiry: "[t]he temporal proximity of the [unlawful detention] and the [emergence of the incriminating evidence at issue], the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." Id. at 669 (Brown v. Illinois, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).

The United States asserts that there was sufficient attenuation between the illegal entry and the seizure of the items in the house to weigh against excluding any of the evidence. Defendant responds by contending that the rapid succession of events necessitates a finding that

both the evidence seized in house and the statements made by Defendant to the police following his arrest should be excluded.

Even though there is some question in the case, based on the testimony of Ms. Flintroy, as to whether written consent to search was obtained from the Defendant prior to the actual search, "[t]he Supreme Court has held that if consent to search is obtained after an illegal seizure, the consent is tainted by the illegality and does not justify the search." United States v. Beauchamp, 659 F.3d 560, 573 (6th Cir. 2011) (citing Florida v. Royer, 460 U.S. 491, 507-08, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). This includes warrantless entry into one's home where there is no exception, such as consent or exigent circumstances. See United States v. Buchanan, 904 F.2d 349, 355–56 (6th Cir. 1990). Because the police failed to obtain consent from a person with common or apparent authority prior to entering the house, the written consent to search obtained afterwards does not vitiate the illegal entry. Therefore, the police must rely on attenuation in order to prevent suppression of evidence and statements collected following entry into the home.

### 1. Evidence in the House

The sequence of events following entry and the seizure of items within the house is fairly murky. During the hearing, the timeline offered by Detective Simpson suggests that the entry and final seizure occurred in less than two hours. Without an intervening event, two hours is insufficient to dissipate the taint of an unlawful entry. See Brown, 422 U.S. at 604. However, the United States contends that this amount of time along with an intervening event, the arrival of Defendant's parents, amounts to sufficient attenuation between the illegal entry and the seizure of the evidence in the house. Generally, an intervening event includes an act of "free will" by the defendant as opposed to events out of his control. See Wong Sun, 371 U.S. at 486

("[Defendant's] statements to the officers in his bedroom, although closely consequent upon the invasion which we hold unlawful, were nevertheless admissible because they resulted from 'an intervening independent act of a free will.'"); United States v. Beauchamp, 659 F.3d 560, 574 (6th Cir. 2011) ("[W]e have held that if a suspect's response to an illegal stop is a new and distinct crime, such as flight or use of force, any evidence recovered incident to the arrest for the subsequent crime is not tainted by the unlawfulness of the initial detention."). The presence of an attorney may also constitute an intervening event. Buchanan, 904 F.2d at 356 (suggesting that a consultation with an attorney could constitute an intervening event). On the other hand, the giving of Miranda rights does not constitute an intervening event. Brown, 422 U.S. at 602 ("If Miranda warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted."). In this case, no event occurred prior to the seizure of the evidence that would constitute an intervening event even considering the arrival of Defendant's parents.

The Court must also assess the flagrancy or purpose of police misconduct which is often considered the "most important" factor in the analysis of attenuation because "'it is tied directly to the rationale underlying the exclusionary rule, deterrence of police misconduct.'" United States v. Shaw, 464 F.3d 615, 630 (6th Cir.2006) (quoting United States v. Reed, 349 F.3d 457, 464–65 (7th Cir. 2003)). There is no indication that the police conduct in this case was coercive, but a finding of purposeful and flagrant misconduct is not limited to situations where the police act in an outright threatening manner. Shaw 464 F.3d at 630. The Sixth Circuit has held that conduct that is not flagrant can still weigh against attenuation, and that the purposefulness factor is "met when the unlawful action is investigatory, that is, when officers unlawfully seize a

defendant "'in the hope that something might turn up[.]'" United States v. Williams, 615 F.3d 657, 670 (quoting Brown, 422 U.S. at 605.).

It appears the police had a specific purpose when they arrived at the Flintroy residence. They intended to find Kenneth Flintroy, Jr. and any evidence they could to connect him to the robberies under investigation. There were no exigent circumstances to warrant their actions. Their illegal entry into the house was investigatory in nature and thus, purposeful and flagrant.

There are no attenuating circumstances present to purge the evidence found within the residence of the primary taint of the illegal entry into the house.

### 2. Statement at Police Station

The interview of the Defendant at the police station occurred approximately three hours after the unlawful entry into the Flintroy's home. More importantly, Defendant's statement to the police was made outside of the home. As such, this situation falls under New York v. Harris, 495 U.S. 14, 110 S. Ct. 1640, 1641, 109 L. Ed. 2d 13 (1990). The Supreme Court in Harris held that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of Payton." Harris, 495 U.S. at 21. The Court explained the significance of the statements made within the home as follows:

> The warrant requirement for an arrest in the home is imposed to protect the home, and anything incriminating the police gathered from arresting Harris in his home, rather than elsewhere, has been excluded, as it should have been; the purpose of the rule has thereby been vindicated.

Harris, 495 U.S. at 20, 110 S.Ct. 1640. Fundamental to the decision in Harris was that "the police had a justification to question Harris prior to his arrest; therefore, his subsequent statement was not an exploitation of the illegal entry into Harris' home." Id. at 19.

The present case is distinguishable from Harris in that Flintroy's statements were a direct result of the exploitation of an *illegal search* of the house, not simply an arrest. In other words, the police would not have been able to ask the Defendant about the presence of the backpack and the other items found in his room if they had not unlawfully entered the room and seized those items. The deterrent effect of suppressing items illegally seized in a home would be ill served if police could circumvent the rule by simply introducing statements concerning that evidence and how it came into a defendant's possession. As succinctly explained in a leading treatise, the difference between statements resulting from an illegal arrest versus those from a search is quite important:

> In the typical case where the defendant was present when incriminating evidence was found in an illegal search or was confronted by the police with incriminating evidence they had illegally seized earlier, it is apparent that there has been an "exploitation of that illegality" when the police subsequently question the defendant about that evidence or the crime to which it relates. This is because "the realization that the 'cat is out of the bag' plays a significant role in encouraging the suspect to speak."
>
> Because this is the case, the more fine-tuned assessment which the Supreme Court mandated in *Brown v. Illinois* for determination of when a confession is the fruit of an illegal *arrest,* is ordinarily unnecessary when the "poisonous tree" is instead an illegal search. As explained in *People v. Robbins* the two situations are quite different:
>
> Confronting a suspect with illegally seized evidence tends to induce a confession by demonstrating the futility of remaining silent. On the other hand, the custodial environment resulting from a false arrest is merely one factor to be considered in determining whether a confession is inadmissible.

6 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.4(c) (2013 5th ed.); see also United States v. Van Dyke, 1:09CR-375, 2010 WL 1949640, *9 (W.D. Mich. May 14, 2010) ("The Court concludes that any incriminating statements Defendant made after being presented with (or informed of) the evidence illegally seized from her residence, were obtained expressly and exclusively through exploitation of the illegal search of her residence.").

Because the Court concludes that Defendant's statements were a direct result of being confronted with evidence unlawfully obtained by the police, his statements are suppressed.

### III.  CONCLUSION

For the foregoing reasons, Defendant's Kenneth Flintroy, Jr.'s Motion to Suppress Evidence [DN 14] and Defendant's Motion to Suppress Statements Made by the Defendant to Law Enforcement [DN 15] are **Granted**.  Also, Defendant's Motion to Suppress Photo Identification and in Court Identification [DN 16] is **DENIED**.

**IT IS FURTHER ORDERED** that "This is Kenny" or "Kenny" be redacted from the set of images if they are used in trial.

cc: counsel of record

Joseph H. McKinley, Jr., Chief Judge
United States District Court

July 7, 2014